The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may draw near, give their attendance, and they shall be heard. God save the United States of America and this Honorable Court. Good afternoon. There are three of us here. Judge Howard is participating, but by phone. He's plugged into the microphones, and he can hear counsel, and counsel will be able to hear him if and when he has questions. With that, please be seated. Court is in session. Today's cases will be called as previously announced. The times will be as allotted to counsel. The first case today, or the only case today, is number 23-2036, 23-2049, 23-2050, 23-2052, 23-2053, 23-2054, and 23-2057, Financial Oversight and Management Board et al. v. U.S. Bank National Association et al. At this time, would counsel for the Appellant's Prosecutor's Assured Guarantee Court please introduce himself on the record to begin? Good afternoon, Your Honors. Matthew McGill, Gibson, Dunn, and Crutcher for Assured Guarantee. I'd like to reserve three minutes for rebuttal. We're going to actually try to hold back on the rebuttal today, and I'll make a judgment on that at the end, all right? Of course, Your Honor. I think there's been so much briefing below and on the field that you probably have a pretty good idea of what the other side's arguments are. Very well, Your Honor. Thank you. This case is about PREPA's power revenue bonds. The Board agrees that these are special revenue bonds protected by Section 928 of the Bankruptcy Code. Yet it takes the extraordinary position that of the $8.5 billion that PREPA borrowed, bondholders should have an allowed claim for only one-fifth of 1% of that amount. The fundamental problem with this argument, and also the decisions below, is that it inverts the order of analysis required by the Bankruptcy Code. The Code starts with the amount of the claim, and that's where I'd like to begin. Under Section 502B of the Code, when there is an objection to a creditor's claim, the first task is to determine the amount of the creditor's right to payment. As of page 1 of its surreply, the Board seems no longer to dispute that we have a right to payment of the amount of principal and interest due. Nor could it. As the Second Circuit held in Chattagay, quoting the Supreme Court in Davenport, a right to payment encompasses any legal obligation. In the words of the Supreme Court, the right to payment is coextensive with the debt. The debt here is for the principal and interest due. That is the amount of our claim, and that means the entire estimation proceeding was for naught. Once the amount of the claim is resolved, we turn to Section 502B1 and ask whether any portion of the claim should be disallowed because it's unenforceable against the debtor. And on this issue, the Board does raise arguments. It says, of course, that we are non-recourse debt and that our claim is 99.8% unenforceable. But the analysis here turns on the remedies provided in the trust agreement, not on labels, not on whether someone characterizes it as recourse, non-recourse, limited recourse, or something else. And here, Sections 804 and 805 empower the trustee to sue PREPA for the full amount due and to recover the judgment from any money available for that purpose forever. That is the opposite of the non-recourse language in the Board's cases that disclaim liability beyond specified collateral. Counsel, can I ask you, just to go back a little bit, do you think there is a difference between non-recourse and limited recourse? The question, Counsel, says there really isn't because you're either recourse or you can only get payment from certain collateral. So limited recourse, non-recourse, it's the same, they say. I think there is a difference, but it's immaterial here because the question is whether our claim is enforceable, or in the language of the Code, whether the claim is unenforceable under the agreement or applicable law. And here, the agreement in 804 and 805 allows us to sue PREPA for the full amount due. I would contrast that with the non-recourse language in, for instance, one of the Board's cases. The Board has cited this case called, To Burn a Preferred Funding. And here, the language provides that, it says expressly, these are non-recourse obligations, and after the realization of collateral and its reduction to zero, any claims of the note holder shall be extinguished and shall not thereafter revive. That is not what 804 and 805 provide. 804 provides for the trustee to sue PREPA for the full amount due, and then empowers the trustee to collect that judgment, not just from the sinking fund, but from any monies available for such purpose. And then 805 says the trustee can collect that money, the monies available for such purpose, meaning for judgment enforcement, now available or thereafter becoming available. So if you're correct that you have a security interest in all the net revenues, in fact, I think you're arguing your brief is all revenues, are those all special revenues? The revenues are special revenues under 9022. So doesn't that create an issue for you under 927? No, because 927, the board attempts to use 927 in conjunction with 1111B. But we don't rely on 1111B. This is, we have debts that are enforceable under the terms of the agreement. We do need to invoke 911, I mean, sorry, 1111B, because 804 and 805 allow us to collect a judgment in the full amount, and then to, and to, through any monies available for any, for the purpose of judgment enforcement. So if we have a claim, an enforceable claim for the full amount due, then the next question is the extent to which it is secured. And this is, you know, this is where most of the contested ground in the appeal lies. The board claims that PREPA's revenue bonds here gain no effective protection from Section 928. It does this by saying that our special revenue bonds, in fact, cover only deposits into the sinking and subordinate funds that once in bankruptcy, the debtor is free to shut off and reduce to zero, and thereby cut off the post-petition revenues that otherwise would be subject to the lien under Section 928. It's a clever argument. The key premise is that the agreement's pledge of revenues is the lien on the sinking and subordinate funds, that the deposits into those specified funds are the only revenues that are pledged. That's the essential premise of their argument. That's wrong for many reasons, and I want to emphasize three. First, the pledge of revenues, both in the Now Therefore Clause and in Section 701, is subject to the 1947 indenture. But the liens provided in Section 401 and 507 are not. So those two liens cannot be coterminants. Here's the second point. Section 516 of the agreement. This provision says that any liens on something called the subordinate obligations fund must be junior to the trustee's lien on the revenues. That makes sense only if the revenue lien encompasses the subordinate obligations fund. But when you look at Section 507, we do not get a lien on the subordinate obligations fund. That's the only fund on which we don't get a lien. So the revenue lien must cover more than nearly the liens in Sections 401 and 507.  The second point of this is that the sinking fund includes monies that are not revenues, such as subsidy payments and proceeds from letters of credit. The board denies this. It says that these are revenues within the meaning of the agreement. But it admits at page 28 of its brief that bond proceeds are not revenues. It can't have it both ways. It can't be that bond proceeds are not revenues, but letters of credit proceeds are. If they are revenues, if the subsidy payments and proceeds from letters of credit, if they are revenues, then its reading of other monies in the now therefore clause is a null set. I'm not sure I can tell where you're driving with this. Are you going towards the point that if we look at existing revenues that come in before the end of the bankruptcy proceeding and you're getting at the definition of those, or are you addressing the question of whether whatever that definition is, it includes revenues that will be received in the future? What I'm trying to demonstrate, Your Honor, is that the pledge of revenues is not coterminous with the liens provided for in Section 401 and 507. So if we were to agree with you that the security interest covers all net revenues, to what extent does that fall short of the points you're trying to make now? It does not fall short, I think, of the point I'm trying to make now. I'm trying to undermine the Board's argument, which is essential to its position here, that the scope of our lien is limited to the specified funds in 401 and 507. Our position is that the pledge of revenues is broader. It covers something more. Our position with respect to the proper and appropriate scope of the pledge of revenues is that it pledges all revenues, capital R in Section 701, revenues. It's a defined term. What difference does it make to you whether it's all revenues or net revenues, since if it's all revenues you say there'd still be a carve-out and a funneling off of the operating expenses? I just want to be consistent with what our position is, and the Board tries to take us to task for not being clear about this. I just want to articulate what our position is as to the scope of the lien. If you turn your attention to the close of the bankruptcy proceeding, at that point in normal course one would think about the debtor being discharged from all debts and obligations except those provided otherwise in the plan. And so at that moment the debtor would be washing its hands. You would have a right to all security interests collateral that you have. What about future revenues, though, that come in? It seems to me the expectancy of those revenues under Puerto Rican law is not property of the debtor that you could have a security interest in. How do you get around that? This is exactly what Section 928 addresses. Section 928 provides that revenues that are taken in post-petition remain subject to the pre-petition liens. So literally post-petition means between now and the end of eternity. It does, Your Honor. Literally. But if we step back and look at the code, you've got these two big markers on the road here. One is the filing of the petition. The other is the discharge that normally takes place at the end of the proceeding. You're asking us, I think, to infer that the first one swallows silently the second and runs right through it. No, Your Honor. I'm asking you to apply Section 928. And the Board does not dispute that Section 928 applies here. It does not dispute that these are special revenue bonds. What it does is dispute the scope of our pre-petition lien. If the Board admits that our pre-petition lien continues post-petition, the question is the scope of that lien, and the scope is, in our view, all revenues with a consensual carve-out for current expenses, which of course just aligns with what Section 928b requires. So would any debt continue after the discharge? The point of Section 928, Your Honor, is that it does not discharge the pre-petition lien. The post-petition revenues. Let me step back for a second. Let's assume 928 clearly says that if during the bankruptcy, like today, some revenues came in and operating expenses were paid and there were net revenues, unlike the normal rule that would apply, because if 928 your security interests were detached and that would be your collateral to what comes from today. We continue to have a property interest in the revenues of the system going forward. But what about after the discharge, after the plan of reorganization is confirmed? The plan of reorganization consistent with 928 cannot destroy our property interest in the revenue. So it can do lots of things to the underlying debt. How do you have a property interest in something if the debtor doesn't even have a property interest in it? The debtor has a property interest in the right to receive its revenues going forward. They haven't come in yet, but they haven't come in yet. Talk about the revenues that they expect to come in in 2028. I understand the question, Your Honor, but this is precisely the point of Section 928, is that it says that the post-petition revenues remain subject to the pre-petition liens. This is always the case with revenue bonds. It's always the case with every revenue bond. It depends on revenues that are being received in the future. Excuse me, counsel. When you say that the Board concedes that the post-petition revenues are included in the secured property, has the Board expressly conceded that post-discharge revenues fit within? Judge Howard, my read of the Board's brief is it concedes Section 928 applies to these bonds. I don't believe the Board has taken a position with respect to what that means at the conclusion of the plan or once a plan is confirmed. Thank you. Thank you, Mr. McGill. Thank you, Your Honor. Thank you, counsel. At this time, if counsel for GoldenTree would introduce himself on the record. He has a 15-minute argument. Good afternoon, Your Honor. Glenn Kurtz on behalf of GoldenTree. I have been designated primarily to address the scope of the pledge. And interpreting the pledge provision starts with the overarching fact that PREPA grants the two separate security interests in the trust agreement. One, a pledge of revenues, and two, a pledge of the monies set aside in the funds, including the sinking and subordinate funds, with that latter security interest in the funds explicitly designated as, quote, further security. Those two separate security interests are provided for in the granting clause, and the opinion of counsel provision then states that each are legally and valid effective pledges. And I note that appellees agree that there are two separate security interests and they account for them and address them in separate headings, revenues, and other monies in their brief as well. And so the trust agreement has to be read in a way that it counts for both of the security interests. As to the pledge of revenues, and I would point the court, if I may, to page 279 of the appendix, that is section 701. It would help, given the complexity, the number of arguments and their interrelation. It would help if you indicated where it is you're driving before you then take us on the trip here. I'm addressing the scope of the pledge. What is your point? In other words, are you trying to say you have a pledge of net revenues? Correct. Okay. So, and I will say that technically speaking, the way the trust agreement works, there's a pledge of revenues at the defined term. That defined term is gross revenues, but the trust agreement further provides payment covenants that allow for the payment of current expenses ahead of the bonds. And so the net consequence of all that is that net revenues are going to the bonds. Okay. And are you going to address whether net revenues that PREPA hopes to get in in 2028 are your collateral? I can address that as well, Your Honor. But maybe the foundational point, I wanted to start with the revenue pledge itself, or at least one of them, which is section 701.  And it states that after the 1947 bonds have been paid, that the bonds are, that the principal interest and premium will be payable solely from the revenues, and said revenues are hereby pledged to the payment thereof in the manner and to the extent herein above particularly specified. Revenues in turn is defined as all the monies that are generated by reason of the operation and ownership of the power system. As I mentioned, ultimately you've got to keep the lights on, and so the revenue pledge in terms of payment covenants ultimately is in effect net. The judge ruled and erred that the word pledge was insufficient for purposes of conferring of securities. So you're still trying to say that you have collateral in the net revenues? Absolutely. Okay. We're on that track still. And the controlling statute, the Authority Act, in fact uses the word pledge, not the word lien or charge, to confer security interest. And the trust agreement uses exactly the language of the Authority Act in creating a security interest in revenues as security for payment of the bonds. And the appellees do not dispute that a pledge confers a security interest. All the authorities said that. And appellees on page 30 of their brief respond that it is undisputed that the word pledge creates a security interest just like the words lien or charge. Additionally, there are two separate provisions in the trust agreement, sections 516C and 712A, that use the very words lien and charge in describing that the bonds are secured by revenues. And so the court clearly erred both in requiring the use of the word lien and charge, which is not required, and also because those words were actually used in the revenue pledge. And that, Your Honors, narrows this pledge appeal to largely one issue, which is the appellee's argument that the pledge of revenues extends only to the revenues that they chose to deposit into the sinking and subordinate funds as they were required to do. Or to state more directly that there is only a single security interest in the sinking fund and not in revenues. And there is a whole host of reasons I'll try to get through as to why that is incorrect. Could you give me some sense of what's at stake in terms of what you seem to be addressing now is the difference between having a pledge in certain designated funds and having a pledge in all of those funds, including net revenues. Quantify roughly ballpark what's the difference there. Okay, so revenues, Your Honor, is all of the monies. I mean dollars. The revenue pledge should be sufficient to repay the $8.5 billion owed on the bond. The sinking fund contains $19 million, an amount insufficient to pay a single monthly coupon. Okay, so that's the magnitude of that issue. Correct. What's at stake on the issue of whether you're entitled to future revenues? So there was a monthly report. That's many billions of dollars. There's a monthly report indicating that as of 2020, $3 billion in net revenues have been received. And so with respect to those billions of dollars, do you have a position other than referring me back to the prior discussion that I had with your colleague regarding 928? Well, those are received, Your Honor. So there's no issue about whether a plan of adjustment can affect the discharge or prepetition liens. It cannot, but with respect to the $3 to $5 billion I'm referring to, those monies are quote received and we're nowhere near finalizing and having a confirmed plan of adjustment. So we don't need 928 yet. The extra $2 million is your estimate, right, of what's come in since 2020? That's correct, Your Honor. So we had about $3 billion that was recorded in a monthly income statement. So we know that came in. We basically averaged out what that looked like it was per year and extrapolated and believe it's around between $5.2 and $5.4 billion. That will have to be addressed, but it wasn't addressed in the court below. In net revenues? In net revenues. Those are net revenues, Your Honor, at least is the way- And that's all put into one side, future? That is putting aside completely the future. Okay. So if I hear you correctly, you're saying even the difference between the parties' positions on money that's already in the TIL is itself several billion dollars? Correct. Okay. This is from 2017 until today. Correct. So, Your Honor, maybe the simplest way to look at this is we have what is an unambiguous pledge of a defined term revenues in 701, but it does continue with this language here in the matter and to the extent here and above particularly specified. You can tell me if I'm wrong, but I thought your opposing counsel had essentially said by the time all the briefing was done that it doesn't really matter if it's net revenues or not, sort of conceding to a certain extent your argument. What really matters is what then can you, you know, which funds can you look to for payment on which date? And they're saying you still have to look at what was available in 2017, and so this whole argument doesn't make a difference. I read the briefs as occasionally saying you have a pledge of net revenues, and clearly it's not as the petition date under 928. Certainly those are maintained. No one has taken a position, I believe, that 928 does not maintain pre-petition liens. It's all plan of adjustment related, as Justice Kiara's been talking about. Other times they seem to say it has to be deposited into the sinking fund. Whenever they say it has to be deposited into the sinking fund, they've eliminated the clear-cut pledge of revenues, one of the two security interests, and collapsed it into one. And the only argument that they raised to support that is the language, what they call qualifying language in Section 701, which is that the unambiguous pledge of the defined term revenues also says in the manner and to the extent here and above particularly specified. Now, that was addressed by Judge Swain, and that part was addressed correctly. The court ruled that the word pledge does not create a security interest, but the court found that that here and above language, it refers to the payment terms, not to a pledge and not to the sinking fund, and the judge was right. The language at issue in 701 is not that the revenues are pledged in the fashion here and above indicated. It says, quote, revenues are hereby pledged to the payment thereof, which is the principal interest and premium of the bonds. And so the court found correctly that that is a qualification of the payment terms, not a pledge. Now, the appellees offer no reason and no language to disturb the ruling of Judge Swain in interpreting the here and above language as referring, as it says, to the payment terms, not to the scope of the pledge or to the sinking fund. And although they're careful not to say it, they're seeking to overturn the court's interpretation of that language because it's their only argument for claiming that the, quote, pledge that the hereby pledges revenues to the payment of the bonds is their only argument for trying to render that ambiguous. As soon as it is accepted that the word pledge confers a security interest, which is the exact words of the Controlling Authority Act and that appellees agree with, you are left with a pledge of revenues qualified only by the payment terms, which is the waterfall, which means that operating expenses get paid first in order, as appellees say, to keep the lights on. Additionally, in addition to the court's reasoning, as I mentioned earlier, if you collapse, if you turn the word pledge magically into the word sinking fund, I'm sorry, the word pledge of revenues magically into the words pledge of sinking fund, then you've eliminated what is one of the two security interests and they admit, and as I mentioned earlier, it's the whole thing. Additionally, and this is really important, Section 701 is structured exactly to do the opposite of referencing a specified fund, including the sinking fund. If you look at Section 701, and again, it's on page 279 of the appendix, it initially limits the pledge to a specified fund. The contract provides that until the bonds issued in 1947 are paid in full, the sole source of recovery is a specified fund. The renewal and replacement fund and the monies in that fund are then pledged to the payment of the bonds, and that's because the revenues were pledged to the 1947 bonds. But after the 1947 bonds are paid, the revenues were freed up, and so the very next sentence says, after the 1947 bonds are repaid, and again, that has happened, that PREPA expands the source for repayment to be revenue, the defined term. So 701 shows you that when the parties intended to limit a security interest to a specified fund, they said that and they identified the fund. And the contract cannot be read as pledging the defined term sinking fund when the parties explicitly used the defined term revenues. That would change 701 from saying that the bonds were payable solely from revenues, and revenues were pledged there to, to instead saying the bonds are payable solely from the sinking fund, and the monies in the sinking fund were pledged. And that's not what it says. But it says revenues are hereby pledged to the payment thereof to the extent here and above particularly specified. So it's the last few words of that sentence. They are opposing counsels focusing on that. Exactly. And Judge Swain interpreted those last few words as referring to payment terms, the waterfall, not the scope of the pledge. And that is correct. Because as I mentioned, that would be saying instead of using the word sinking and subordinate funds, we decide to use the revenues, and then we have a secret code in the clause here and above particularly specified. And then that secret code changes revenues to a word that was in use. That's not a reasonable read. Also, why would you use the word revenues? You wouldn't need them at all. You wouldn't have a revenue pledge. You wouldn't have a descriptive heading that was a revenue pledge. And you would also be rendering Section 701 completely superfluous. Because there's already a pledge of the sinking fund in Sections 401, 507, and 513 using the words pledge of monies. And so the 701 would just repledge that but use the wrong words. It would be using the words revenue instead of sinking fund. And there are also six other provisions in the contract that explicitly state that the bonds are secured by revenues, not by the sinking fund. And if 701 was supposed to be a puzzle that once solved, changed the word revenues to the phrase sinking fund, then the subsequent provisions would state that under 701 that the bonds are secured by the sinking fund. But they say ten times they are secured by revenues. Also, that here and above language is included in the pledge prior to repayment of the 1947 bonds. And that clearly is a pledge of the renewal and replacement fund. It can't be that the renewal and replacement fund becomes a sinking fund through this code of here and above particularly specified. In fact, no money is going into the sinking fund until the 47 bonds are paid. And if you look at Section 712A, that is one of the provisions for protecting the source for repayment. And that applies to funds. That prohibits liens and encumbrances on the revenues. Now, and that's so nobody can get parried with or senior to. It says that, can I finish this section? Yes, go ahead and finish it. That PREPA, quote, will not create or permit or permit to be created any charge or lien on the revenues ranking equally with or prior to the charge or lien on the revenues of the bonds issued under and secured by this agreement. If the bonds were not secured by revenues, those revenues would be free to be pledged to others. And this would only be an encumbrance on the sinking funds. But it doesn't. It applies to revenues because this agreement is unambiguous in pledging revenues as security for the bonds. Thank you, Mr. Kurtz. Thank you very much. Thank you, counsel. At this time, if counsel for the PREPA Ad Hoc Group would please introduce himself on the record to begin. You have 15 minutes. Judge Kayada? Yes, Judge Howard. Could we pause for 60 seconds? I don't need a recess, but could we pause for 60 seconds? We're on hold for 60 seconds. Counsel, please be reminded the microphones are live at this time. We're on hold for 60 seconds. Thank you, JGKF. All right, we'll put us back on the record, please. Please go ahead. Thank you. Eric Bromstad on behalf of the PREPA Ad Hoc Group of bondholders. Judge Rippleman, I would like to address your question you made earlier about the scope of the security interest. Not to be dramatic, but because the entire foundation of municipal finance rests on one answer. Your Honor, ask the question, an excellent one, about can you give a lien in the future revenues? What is a lien actually in? And Judge Cahill, you asked, what happens in bankruptcy to this? I want to address those questions because they are foundational and they are fundamentally important. Fortunately, I've been teaching Secure Transactions and Bankruptcy Law for 34 years, and this question comes up a lot. The answer is in Section 9204 of Article 9, which states precisely, a security agreement may create or provide for a security interest in, after acquired collateral. The statute, which applies here, Puerto Rico has adopted Article 9, this section applies, rejects what gave the courts a lot of trouble, the Nino-Dodd principle. You couldn't give a security interest in what you didn't have yet. That was Benedict v. Ratner. The statute overrules that. You have a lien on not only the present, but future revenue, collateral, and security interest in the stream. On page 42 of our reply brief, the yellow brief, we cite the cases, including the White and Summer Treatise, which makes that point. You have a lien on the revenue stream, not just what was existing on the day the trust agreement was signed. Now, what happens to this in bankruptcy? Liens ride through bankruptcy unaffected, that's a Supreme Court decision in Johnson, subject to modification by a plan. Under Section 1129, the secured parties must be given the value of their collateral and be paid that value. They must get that. Your Honor asks, what happens to the debt? The debt continues. The debt is subject, perhaps, to modification under the plan. But as my learned counsel said, we start with what is the amount of the claim? Here, the claim is $8.4 billion. Then we get to what is the collateral securing it. Under this agreement, which is a plain, vanilla municipal financing security agreement, as the expert established below, is a lien on the revenues. Not the net revenues, but the revenues. And it's important, as the expert explained, not to confuse the lien conferring provisions of the trust agreement with the collateral disposition provisions that say what you do with the revenues. So the lien subsists, and then we get to Section 929 of the Bankruptcy Code. In the ordinary Chapter 11 case, when the debtor files a bankruptcy case, the lien on the collateral, here a stream of income, is normally cut off under Section 552. In 1988, Congress modified the Bankruptcy Code in Chapter 9 to prohibit that. They specifically adopted Section 928, which has a completely different result. As your Honor recognized in your Honor's concurrence in the Section 928 litigation, the bondholders are entitled to keep their lien on the stream of the income. That is what Section 928 provides. That is what their lien is under Article 9, under the Authority Act, which allowed PREPA to give a lien on the stream of revenues, which it did. I think the linchpin in that discussion was the notion that the debt would not be discharged at plan confirmation. The debt may be modified in confirmation under Section 1129. The lien may not. These are two separate concepts. The lien is a property right protected under the Fifth Amendment from taking. It cannot be taken in bankruptcy. That's why we have the provisions of the Bankruptcy Code that we do to protect the lien. So you're saying you could have the debt discharged, and then a year later the debtor acquires property. The debtor then owing nothing. The property, though, is still subject, as after acquired property, to a lien issued. No, Your Honor. No. The debt is supported by the lien. The parties have a right to payment against their property to secure the debt. So the debt continues post? Correct, and the debt must continue in a minimum amount under Section 1129 equal to the value of the collateral. Now there is an option under the Bankruptcy Code, under Section 1111, to take an election to allow the entire amount of the debt to continue unaffected. That's not an issue here. We don't need to decide that. The point is that the debt continues, and they must pay at least the value of the collateral. Now I really wanted to address something that is critical, and that was how do we interpret this security agreement? Because the way the district court did it was completely incorrect. This is an Article 9 security agreement. An Article 9 security agreement is an Article 1 agreement, and an Article 1 agreement includes as part of the bargain, in fact, custom and practice, which under Puerto Rico statute, like every other jurisdiction that is enacted, Article 9 and Article 1, is part of the agreement, and under Section 455 of Puerto Rico's Article 1, 1203 in the generic. The expressed terms of an agreement and custom and practice must be construed together as consistent unless it would be unreasonable. As Section 1303 of Puerto Rico's 455 says, custom and practice supplement and qualify the terms of the agreement. Why? This is Carl Llewellyn's contribution. The bargain of the parties, in fact, not in law, in fact, includes custom and practice. Why? Because we do not want one-off interpretations like the kind we have here. We want interpretations that are consistent with custom and practice. Now, in this case, the oversight board and the district court's interpretation is unreasonable. Why? Because they say that certain specific provisions of the agreement designated as further security, Section 401, Section 507, are exclusive security. That's not reasonable. Their interpretation of the agreement renders the financing statements meaningless. The financing statements are only meaningless to perfect a security interest in the revenues, which are accounts or general intangibles perfected by a financing statement. They say the collateral is limited to deposit accounts perfected only by control. That renders the financing statements meaningless. As a matter of law, we must construe all of these documents together. Their interpretation is unreasonable. The district court ignored the financing statements. That was improper and, again, implied an incorrect method of interpretation. The district court applied a four-quarters analysis. I just look at the terms and I construe them for myself. That is not how we interpret security agreements under the Uniform Commercial Code. It is not how we interpret this. So if I'm perceiving the picture that you're painting correctly, are you essentially saying that when you have a relationship between a municipal debtor and a creditor who has collateral in the net revenues of the debtor, that as between those two, essentially there is no bankruptcy? No, Your Honor, there is a bankruptcy. Well, what's it do? What's it change? Well, what happens is, just like in Jefferson County. Excuse me, Your Honor. I apologize. In Jefferson County, the debtor, the county filed for bankruptcy. There were bondholders. And Judge Bennett correctly interpreted the interplay between the bankruptcy code and the revenue bonds. He said, I looked at customer practice to interpret the agreement. You've got a bunch of revenue. You've got a lien on the revenues. Let's figure out what the revenues are, what the revenue stream actually is. How would the relationship be any different had there been no bankruptcy here? Had there been no bankruptcy? Between the debtor and the bondholders. I understand, Your Honor. That's an excellent question. Outside of bankruptcy, the bondholders would have been entitled to the remedy of mandamus, to compel PREPA to pay the debt. They would have been entitled to a receiver to compel PREPA to raise its rates to pay the debt. They would have been entitled to a judgment as a matter of law to compel PREPA to get the debt. They would have been able to exercise all kinds of remedies, which Judge Rickleman, that's why this is not non-recourse. Non-recourse means there's no recourse to the debtor to do various things. You're stuck, like in a real estate transaction, to a lien just on the real estate, and you can only exercise your remedies in rent. This trust agreement and the authority active in personam remedies against PREPA. That's why it's not non-recourse. It's limited recourse. Judge Swain was correct on that. The arguments that they present are wrong. But back to your point, Judge Chaotic. The point is, what would happen in bankruptcy? Outside of bankruptcy, they would be able to compel payment, compel the raising of rates, et cetera, et cetera. It's part of their package of rights. Bankruptcy under Chapter 9 is an opportunity to give the debtor a breathing spell, which it's had since 2017, negotiate a proper restructuring based upon doing it the right way, which is to treat all the creditors equally, value their collateral, and give them distributions of a secured creditor, which they are not doing, and allow them to adjust their debts, to modify their debts. Perhaps in this case, to value the collateral stream and say, well, your collateral stream is only worth $7 billion rather than $8.5. So we will pay you $7 billion out of the bankruptcy. That's how we're going to adjust the debts. So I think that hopefully crystallizes it, Judge Chaotic. In bankruptcy, it's an opportunity to value the collateral stream but unquestioned and then decide how much you're going to get paid. That's the right way to do it. What incentive would the creditor have to agree to a lower value, given that once the bankruptcy is over, the remedies you've just described would still be applicable as I understand your description? Because what happens in bankruptcy is, let's say, there was a consensual plan that was confirmed that paid the bondholders $7.5 billion. The discharge provisions under Section 1141 would bind all parties to that provision. But for constitutional reasons under the Fifth Amendment and for statutory reasons under Section 928 and for state law reasons here, Puerto Rico law, the bondholders have a valid, perfected security interest. It's unavoidable because it's properly perfected in the revenues as accounts, which is a property right that they are entitled to get the value of in bankruptcy, and that has to be preserved through the plan process. Congress made that plain in Section 928. And to bolster that, this agreement not only gives a security interest in the revenues, it impresses the revenues and trust in Section 601. But this is not an avoidable security interest. Your Honor, I think hopefully identified that as a question when Your Honor issued the order to guide our discussion today. Because this is a security interest under Article 9 in revenues and accounts or general intangibles, that's what revenues are. We cite a number of cases for that proposition. They do not refute that. That's properly perfected by filing a financing statement. We did that. And this Court has held before a properly perfected security interest is not avoidable in bankruptcy. Alternatively, it is a valid lien under the Authority Act, and they cannot get a judgment credit lien ahead of us under Section 196.0 of the Authority Act. Accordingly, for a second reason, they can't avoid the security interest. So they must respect the security interest, provide its full value in their plan, and also in addition, this obligation that they have under what is called a trust agreement is in fact a trust. Yes, Your Honor. Just going back to your argument, I understand the structural arguments you're making, but just to sort of bring us back to the text. It really focuses on 928 and the interpretation that special revenues acquired by the debtor after the petition is filed shall remain subject to any lien. And you're saying that continues after confirmation. And I'm just wondering, how do you get that from this language? Yes, Your Honor. That's an excellent question. And it's actually a three-part answer. Well, before you go into your three parts, let me just emphasize one other thing. Because again, the beginning or the key phrase is special revenues acquired by the debtor. And so going back to Judge Kayada's earlier question, at confirmation, you don't have those additional revenues. They haven't been acquired. Yes, Your Honor. So it seems like kind of a big exception to the bankruptcy process. Your debt can no longer be discharged. That's an excellent question, Your Honor. And it's not a big exception. And it works in three ways. There's the pre-bankruptcy stage in which the property right is created. That's what we have under the trust agreement. We have a security interest in the revenues, which is in the revenue stream, not just what they have in 1974 when they signed it. It's the revenue stream. When the bankruptcy case is filed, if this were a Chapter 11 case, ordinarily, that stream would dry up on the petition day because of Section 552 of the bankruptcy code, which says that the lien won't continue in the stuff that's acquired,  But then the question is, why doesn't it dry up at confirmation? Because that deals with the post-petition pre-confirmation phase. What happens during the bankruptcy? The lien continues. Under Section 1129 of the bankruptcy code governing the confirmation standards, the secured party must, in a crammed-out situation, which is what we are in, retain its lien and get paid the value of its lien. That's phase number three. So under 1129, you must get the value of your lien and retain your lien on the collateral if the debtor is going to retain the collateral, which is what they are doing here. They plan post-petition, post-confirmation, to keep the revenues. 928 preserves the revenues through the bankruptcy. We're entitled to it. And you must construe the statute this way, and here's why. If you did not, then PROMESA, which was enacted after this trust agreement was put in place, would retroactively take away property rights in violation of the Fifth Amendment. So under the Canada Constitutional Avoidance, you must not interpret this statute as taking away a vested property right. But that's not necessary. The Canada isn't necessary to be invoked because 1129 is clear. In order for them to retain the collateral in which they intend to do the revenues, post-confirmation, the secured party must, in order for the plan to be fair and equitable, retain its lien on the revenues, be paid the value of its collateral. The collateral secures the debt. The bondholders must, at a bare minimum, get the value of their collateral, which is why having a lien on the collateral is so important. But I cannot underscore enough, this trust agreement is a plain vanilla. I've read thousands of security agreements out there. The way that they interpret it, there's a reason why there's no expert report on the other side. No expert would ever endorse their interpretive arguments about this agreement. Why? This trust agreement is how it is done in the marketplace. The expert explained the as-here-before language would not be construed in the marketplace as narrowing. This grant clause in the front, which is where they always are, the grant clauses are up in the front, that is not properly construed as being merely preamble. The market would have recognized that as being a valid grant on the revenues. It doesn't say net revenues. It says revenues. On 1129, the retention of the lien, what does it mean by the lien? It's one thing to retain all rights that you have as of that moment, even those acquired post-petition. Your proposal, though, is that we read it as retaining the right to acquire additional collateral even after the discharge. Excellent question, Your Honor. We only ask excellent questions.  The Supreme Court says we decide what property rights are by reference to the law that created them. Here are the Authority Act and Article IX of Uniform Commercial Code. The lien is on the stream of the revenues. Again, this is the point that gave the courts, including this court, long ago, problems. How can you have a lien on something that isn't yet existing? Benedict v. Ratner. The drafters of Article IX, Grant Gilmour and Carl Llewellyn, overruled all of that on purpose, including Section 9204. The lien is on the stream, not mimoed up, what you just have at one particular point in time. So we look at state law, and state law says you have a lien on the stream. That is protected by the Fifth Amendment. We are now in bankruptcy. Bankruptcy applies. They have an opportunity for a breathing spell. The automatic stay kicks in. We can't exercise our remedies. They can propose a restructuring plan. We can negotiate. We can argue about the value of the collateral. But the lien right that is preserved and must be preserved, this is the Supreme Court's decision in Radford. This is the Supreme Court's more recent decision in the Industrial Bank. You must, as a matter of constitutional law, be maintained in the value of your collateral. You have to get at least that. Yes, Your Honor. Let me see if Judge Howard has any questions. No. Thank you. If Your Honor will permit rebuttal, I would permit the opportunity, depending upon what my adversary says, as Your Honor has said at the beginning. Thank you. Thank you, Counsel. At this time, the Counsel for the Financial Oversight and Management Board will... I think we're going to take a brief break now. All rise. Court is taking a brief recess. I will say, if we do allow rebuttal, there should be one rebuttal from the affluent side, so you might want to use this time to discuss whether you would... who would do it. Yes, Your Honor. Very much appreciated. Thank you. At this time, would the Counsel for the Financial Oversight and Management Board please introduce himself on the record to begin. Thank you. May it please the Court, my name is Martin Biedenstock. I'm a partner at Proskauer Rose, LLP, representing the Oversight Board as the Title III representative of the debtor front. We had planned, subject, based on this Court's January 22, 2024 order, to allocate the issues as follows, although I did notice that most of the colloquy has been on scope of the security interest and recourse, and maybe it will be the same. But to the extent we can, I was going to cover the ECC, the Uniform Commercial Code aspects of the scope of the security interest and the perfection avoidance issues, and then non-recourse, and then the trust claim. Mr. Pedro Jimenez of Paul Hastings, Attorneys for the Creditors Committee, will address other aspects of scope and recourse, and Mr. Peter Friedman of O'Melveny & Myers, Attorneys for APOC, will principally address the estimation. Despite all my plans and preparations, I obviously want to address the colloquy I just heard. To say the least, we disagree entirely with the positions that have been urged this afternoon, and my job is to explain why. So before I get to the scope and perfection issues, I want to address the arguments we just heard. First, we heard a remarkable, and if the court considers rebuttal, I'd like to ask that the court consider it for us too, since we're cross-appellants, but I'll put myself at the mercy of the court when you make that decision. We heard the extraordinary assertion moments ago that the bondholders at the time of the signing of the trust agreement obtained a valid and perfected lien on all future revenues, period, and whether they're gross or net, they want all future revenues. And nothing could be further from the truth. The ad hoc group in its brief selectively quoted from a comment to UCC, comment two to UCC section 9-204 for the proposition that it authorizes and approves liens on future revenue streams. I can't emphasize enough that the ad hoc group in its brief at page 42 quotes the first sentence of the comment but doesn't quote the next. The next provides, this section adopts the principle of a continuing general lien or floating lien. It validates a security interest in the debtor's existing and upon acquisition future assets, even though the debtor has liberty to use or dispose of collateral without being required to account for proceeds or substitute new collateral. Bottom line, they conveniently left out the part of the comment that says upon acquisition. There is no such thing as having a security interest today on property that doesn't exist yet that the debtor has no rights in. What we're talking about is power that PREPA will manufacture in the future, will sell in the future, and hopefully be paid for it in the future. It doesn't have any of those rights today. Counsel, I have one quick one. I'm sorry to interrupt you. I have one quick question. On your read of 9204, at what point would the security interest be perfected? Okay. That question I submit is a little more loaded than Your Honor might have intended, but I'll try to answer it as briefly as I can. First, for the security interest to attach, the PREPA has to have sold the power, and if we're talking about a perfected security interest in revenues, the revenues have to have been sent to PREPA. The trust agreement defines capital or revenues as monies received and net revenues the same, received. Counsel, I thought that was your answer. That's all I was looking for. Okay. Thank you. I will get to more of that, but that was the short answer. So go back to 9204. A debtor, you can have a security interest in after acquired collateral, so that presumably means something that is not the property of the debtor as of the day the agreement is signed. When Your Honor says have a security interest, Your Honor, I think the correct articulation is you can contract to grant a security interest in after acquired collateral today, but the security interest will not attach to it and you will not have it perfected until, at a minimum, the property exists and the debtor has interest in it. It says a security agreement may create or provide for a security interest in after acquired collateral. Right. Then it says it does not attach to consumer goods. That would imply it does attach to this type of obligation. Well, under the Uniform Commercial Code, no security interest can attach until, number one, the property exists, number two, the debtor has an interest in it. And here, the future power doesn't exist yet. The monies to pay for it don't exist yet. PREPA has no interest in them, so today it is an impossibility under the Uniform Commercial Code for a creditor of PREPA to have a security interest, let alone a perfected one, in future revenues that don't exist yet. So could you give an example of an after acquired collateral? Sure. In the PREPA case, the trust agreement provides that when PREPA generates revenues, pays current expenses and deposits the net into the special funds, the security interest will attach. And that's based on the trust agreement that was signed many years ago. So it attaches when the property exists and the debtor has interest in it. So why would it not attach to a property that comes into the possession of the debtor two years from now? If the... And assume the bankruptcy plan of reorganization was closed out in the interim. Okay. I want, obviously, to cover that. The Bankruptcy Code provides in Section 1124 that the debtor has the option to reinstate a debt agreement. Suffice it to say, Your Honors, haven't heard about any reinstatement here because we're not reinstating this trust agreement. If we don't reinstate it, it's a claim. And as Your Honors know from other bankruptcy cases, it can be a secured claim, an unsecured claim, recourse or non-recourse. But for now, I'll just concentrate on secured and unsecured. To determine the portion of it that's secured, you look at the collateral encumbered by perfected security interests as of the petition date or at the latest on the confirmation date. That's the secured claim. The unsecured claim, if it is a recourse claim, would be the deficiency. If it's not a recourse claim, the unsecured claim would be zero. And this trust agreement is being treated exactly like that and similar agreements are treated like that in all the other Chapter 9 municipal bankruptcies. There is no such thing as Section 928 preventing a bond agreement, a special revenue bond, from being restructured and discharged because the same rules apply that I just went through. It can be reinstated, in which case you pay it according to its terms, or it cannot be, it's just a claim. You pay the secured claim the value of its collateral and you pay the unsecured claim, if it's recourse, whatever you have to given the financial situation of the debtor. So that's where I think, if I understand the other side's argument, 928 would enter the picture. I think the argument would be, yes, but for this type of special revenues, the lien keeps going. Well, it can only keep going for as long as the special revenue bond agreement, here the trust agreement, exists. And under PREPA's proposed Title III plan, the agreement is not going to exist after confirmation. We're going to pay the secured claim. If there is an unsecured claim, we'll pay it the appropriate amount. And it's gone. It's extinguished. So there won't be any special revenues under that bond agreement post-confirmation. They can't make us keep an agreement in place. All they can make us do is pay them their secured claim and an appropriate amount on their unsecured claim, if they have one, as part of the plan. And all this other, well, there are comments to the contrary. We simply disagree with the reasons I provide. Now, another point that counsel made is that whatever the terms of the trust agreement are, it has to pass some test that presumably the trial court or this court will impose as to what you think a reasonable trust agreement would have provided based on usage of trade, course of dealing, market norms, et cetera. The ad hoc group writes at page three of its reply that, quote, under Article IX, whether a security agreement creates a security interest, in particular collateral, does not depend on the use of particular terms of art or magic words, but rather is a question of reasonableness, end of quote. I can't make this up. The ad hoc group says appellees do not dispute that. For the record, we do. We submit it's nonsense that a multibillion-dollar commercial deal amongst disdicated parties is subject to someone else's notion of reasonableness rather than what the words say. Commerce would stop dead if, notwithstanding the words commercial parties agree to, the deal would be interpreted to mean whatever a court deems reasonable. Judge Swain meticulously enforced the words, which I will address very briefly. I'd also like to point out- Counsel, you did concede that there don't need to be magic words, right? I think perhaps that's what your opposing counsel is referring to. Well, but they're going-particular terms of art or magic words. I think you conceded, for instance, that the phrase we pledge so-and-so as security is enough to create a security interest rate. That is a concession you made in your briefing. Okay. I will go through, and we've done it in our papers, so I'll just quickly explain to you how-we agree. The issue is what do the words say? We're not saying you need magic words. What I was addressing was whatever words you use, they can't be varied by someone's notion of reasonableness based on supposed market norms. I think it's a sharp and hypothetical, and I'm not saying which way it goes. I think the kind of concept they're putting forward is if you have words that you might read differently, you might read one way or the other, but there have been 10,000 transactions in commerce, and every single one of them, everyone treated it as the same way over the course of 20 years, so why read it differently? Wouldn't you just assume that, in effect, those type of transactions, people knew what they meant by that and intended it? Well, that might be a kinder way of interpreting what they're saying or a different way, but there's no basis here to vary the terms. And I'd just like to put this in context. The municipal bond market is $3.8 trillion. There are 35,000 issues of bonds, and they're purporting to tell your honors that there's one norm that applies to this case. That's preposterous. People negotiate based on need, interest rate, all sorts of different commercial factors, and the notion of imposing one, your honor posited, well, what if everyone does it the same? Well, I think your honor would probably hopefully agree, 35,000 bond issuances have not been the same. They're different terms. That's why, you know, you can't take it off the shelf and just sell it again and change the names. They're all negotiated. Additionally, the ad hoc group miscited UCC Section 9-315C, and I'm sorry, it wasn't 9-315. They cite the provisions of the UCC that go to reasonableness of reconciling uses of trade and course of dealing. And what they don't say is that the actual words take precedence if you can't reconcile them reasonably. Well, here, the trial judge and the board asserted that the security interest attaches to the net revenues deposited in certain funds. And they're saying, oh, let's use common usage and the like, and the security interest actually attached years ago to all future revenues. They can't be reasonably reconciled. So the UCC provides you go with the actual words when the reconciliation is clearly unreasonable. Let me get to the crux of the point that I was surprised they didn't cover. The only bank accounts they have control of are their own bond trustees' bank accounts, where actually their prep is bank accounts, but they're held and controlled by the bond trustee. And the bond trustee can take money from them to pay the bonds, and the control is what perfects their security interest in the revenues in those accounts. Now, they were positing this afternoon that they have a lien against future revenues, whatever flavor, amount, future revenues. That doesn't get them anywhere because when the future revenues flow into PREPA's other accounts, the revenue fund, the general fund, et cetera, they don't control those accounts. So if they don't control them, they don't have a perfected security interest in them, with one exception. And if they don't have a perfected security interest in them, then as Judge Swain explained under Section 544 of the Bankruptcy Code, PREPA, in its hypothetical judicial lien status, trumps their unperfected security interest. So the only way they can have a perfected security interest in PREPA's bank accounts that contain revenues is if those revenues are proceeds of something else in which the bondholders have a perfected security interest. The only way the bank account containing those revenues can be a bank account containing proceeds is if they're proceeds of PREPA's right to receive the revenues. All afternoon, I don't think your honors heard anyone argue or explain how they have a perfected security interest in right to receive revenues. So are you saying that to perfect security interest under an arrangement, anything like this, the creditor would have to take control effectively of all bank accounts of the debtor, because once the money came in the door, if it were in some bank account that wasn't controlled by the trustee, you would say it's lost its perfected status? With one exception, and that exception is if PREPA's other bank accounts contain revenues that are proceeds of other collateral in which they have a perfected security interest. Right, but in this type of transaction, there is no other collateral. Right. And this is a fairly common type of arrangement for special revenues. And so my point is that even if your honors agree that their lien is more expensive than the lien that Judge Swain determined, it doesn't help them because they don't have a perfected security interest in those other revenues. Don't they differentiate between monies held on account and money deposits? Well, I'm not sure that there's any monies held on account. The electric bills are paid to them and they put it somewhere. And if they put it somewhere and they had a lien on the right to receive, then it would be perfected. But they haven't even argued this afternoon that they have a perfected lien on the right to receive revenues. So all of this expansive security interest they're talking about doesn't even help them if you agree with them. So we've seen this waterfall type arrangement before, so I'm guessing it's not exotic. No, it's not exotic. But you seem to be saying all of them would have this flaw in their perfection. Unless the trustee took over every single account. Two things, Your Honor. One is that in other deals, the bondholders are not always restricted to a lien on monies the debtor deposits into certain funds. That was the weak link here. The obligation of PREPA to take the net revenues and put them in special funds is essentially an unsecured obligation. And that was one of the weak links. But suppose we were to read the agreement, trust agreement, as granting a security interest in all net revenues. You'd say that, oh, well, so what, except to the extent they actually made it to one of the special funds. Right, because they would have an unperfected lien on the additional net revenues. But don't they argue the UCC filing perfected that lien? Pardon me? Didn't they argue the UCC filing perfected the lien as to the rest of the net revenues that don't make it into the specific funds? That's the critical point. They filed financing statements. Those financing statements are only effective to perfect a security interest in the other funds, in the other bank accounts, if the monies in those other bank accounts are proceeds of something else in which they have a perfected security interest. That something else, in other cases, would be the right to receive the revenues. But here they don't have a perfected security interest in the right to receive revenues. So when the revenues come in to PREPA's other accounts, they're not proceeds, and therefore they don't have a perfected security interest in them. What does the record show concerning custom and usage in this area? Very interesting, Your Honor. Robert Lamb's declaration, which Judge Swain would not accept into evidence, but it's in the record. And I think it's at, if I remember right, it's at appendix page 166 or 266 to 288. It's a 20-some-odd page declaration that says the custom would be to have a lien on all present and future revenues to be granted it. It doesn't mean it would attach right away, but to have a lien on that. That's what it says. Nowhere in that declaration does Mr. Lamb say that it's standard custom to have a lien on the right to receive the revenues. And that's the nub of my point. Even if Your Honors say to them, okay, you have a lien on more revenues than Judge Swain gave you credit for, they wouldn't have a perfected security interest in those incremental revenues because they're in bank accounts not controlled by them. Now, our, if I may, just two sentences. Our reading of the trust agreement is very straightforward. Whatever you want to call the now therefore clause, what's important is what the words say. It says, revenues small are pledged to the extent provided as follows. It's sections 401, 507, and 513 that specifically expressly say certain revenues are subject to a lien. That's it. That's why Judge Swain concluded, and we submit she was right, those are the only revenues, the ones put into the special funds that are subject to their lien. But as I said before, even if Your Honors disagree and expand it, without them having a right to receive future revenues, they're in no better shape. Thank you. Let me just ask Judge Howard if he had any questions. I'm all set. Thank you. Thank you. Thank you, counsel. At this time, counsel for the Official Committee of Unsecured Creditors, please introduce himself and his record. He has a 12-minute argument. May it please the Court, Pedro Jimenez of Paul Hastings, LOP, on behalf of Appellee Cross-Appellant, the Official Committee of Unsecured Creditors. I echo Mr. Beanstalk's request to permit us a brief rebuttal if the Court so desires to permit the parties to present a rebuttal. I want to begin by addressing the Court's question regarding the correct amount of the bondholder's allowed claim. The district court below found that the bonds hold two claims. The first is a secured claim equal to the amount of monies on deposit in the sinking fund as of the commencement of PREPA's Title III case. The second claim, which is the subject of the committee's appeal, is an unsecured claim equal to the net present value measured as of the Title III petition date of what the bondholders would be able to realize through the exercise of the equitable remedies under the trust agreement. That second claim, as we extensively briefed, is inconsistent with the language of the trust agreement and contrary to how non-recourse obligations are treated in and out of bankruptcy. With regard to the trust agreement, Sections 804 and 701, when read together with Article V of the trust agreement, demonstrate that recourse on the bonds is limited to a certain of PREPA's specified assets and that the bondholders may not look to PREPA generally to recover any deficiency. That, I submit, Your Honors, is the quintessential nature of a non-recourse transaction. What does a clause like that mean when, with the other hand, you're saying, by the way, we've got a security interest in all of your revenues save necessary operating expenses, but there's nothing else you could sue them for? Your Honor, that's the normal nature of a non-recourse transaction. The parties contractually agree that they can look to their collateral for repayments and to the extent that the value of that collateral is insufficient to cover the full amount of the debt. It's like saying, here, the collateral is, I've got a security interest in everything you possibly own or ever will own, but I won't sue you personally. Well, in this case, Your Honor, it's specifically to PREPA. The bondholders, even under their own construction of the trust agreement, don't have a security interest in all of PREPA's assets. They have, according to them, a security interest that's limited just to either capital or revenues or to net revenues, but that is still a specific or limited pool of assets to which they can recover. Now, we don't agree with that position. We think 804 limits the recourse even further to the pool of assets they can look to, but even accepting their view, that is still a non-recourse transaction. They have limited to the extent that the net revenues that they have a lien on, and as Mr. Bedenstock correctly pointed out, that they actually have properly perfected, ultimately comes out to be less than the amount of the debt. They don't get to look anywhere else to recover that deficiency. They're limited to the value of that collateral. Now... Counsel, can you comment on the argument from your opposing counsel that there's about $5 billion, if they are correct, that what they have as their collateral is net revenues? This is the 920 that gives us... No, this is $3 billion came in by 2020, and they've estimated another $2 billion since then. Your Honor, I will submit to the court, I have not seen any such financial statements or operating reports to suggest that during the pendency of the Title III case that there have been any net revenues that have been generated by PREPA that otherwise would have gone to repay the bonds. So I can't respond to the specific numbers that were alleged or purported by the appellants. But do they cite to... They seem to reference a particular document. Are you saying you've never seen that document? I personally, Your Honor, I can't say that I've seen the document that they're referencing. I think more importantly, which I'll talk to in a minute, I think 928 really limits their recourse in a way that we'll get to. But let me do this, Your Honor, if I can. Let me go start with 804, because I think that there is a real divergence of opinion as to what 804 does and how 804 should be interpreted in terms of whether or not the bonds are non-recourse or not. The bondholders contend that they have a claim for the full amount owing on the bonds, because Section 804 allows them to sue for that amount. I want to be very clear, Your Honor. We don't contest that. We concede that they have a right to payment for the full amount of the bonds. As it pertains to recourse, however, that completely misses the point. Of course, every creditor, including a non-recourse creditor, can sue for the full amount owing. What the bondholders overlook, though, is that the same sentence of Section 804, that the bond trustee may collect solely from monies in the sinking fund and any other monies available for such purpose. Thus, the bondholders may sue for the full amount of the debt, but they may collect solely from a limited pool of assets. In this case, what's inside the sinking fund and any other monies available for such purpose. The phrase used in Section 804 that any other monies available for such purpose, contrary to the bondholder's position, does not open up a back door for general recourse to PREFA or even recourse to all revenues. That phrase, if read together with the rest of the trust agreement, is more properly understood to refer to other monies that become available to service debt on the bonds. In this case, the subordinate funds, because those are the only source of monies from which amounts due under the bonds can be paid under the waterfall structure of the trust agreement. Are all net revenues potentially available for payment of the bonds once they go, and then the question is, how are they paid while they go through the waterfall? Correct, Your Honor. Under the normal structure of the waterfall, after current expenses have been paid, net revenues at that point would flow into the sinking fund, and to the extent that they satisfy the necessary amount that seems to be retained in the sinking fund, then they would flow to subordinate funds. In this context, when you talk about monies available for such, or other monies available for such purpose, what the agreement is referring to is, okay, in the event that there's an event of default and the trustee sues, collection is limited first to the sinking fund. Again, I don't think anybody is disputing that the sinking fund is available as recourse to the bondholders. And then, and only to the extent that there are amounts insufficient in the sinking fund, does the trustee then get access to monies in the subordinate funds, and only in the sequence that they're laid out in the trust agreement. So their first is the sinking fund, then there's subordinate fund one. If the obligation still hasn't been paid in full, then subordinate fund two, and likewise to subordinate fund three. That is what we submit in the other monies available for such purpose. The other funds that are available to repay the bonds in the event that there's a default and the trustee sues to collect on the bonds. The bondholders construction, however, does not reconcile with the very words used in section 804, because if capital R revenues was what was intended for that phrase, there would simply be no need for the drafters to have utilized the term solely, nor have expressly referred to the defined term sinking fund, since all revenues by their own definition includes all monies on deposit in the sinking fund. In other words, the bondholders proffered construction of section 804 would mean that recourse is solely to everything. That, your honors, I submit, would lead to an absurd reading of section 804. We acknowledge that section 804 does not use the defined terms reserve maintenance fund, self-insurance fund, and capital improvement fund to refer to the subordinate funds, but as I discussed just a few minutes ago, the absence of those defined terms makes perfect sense, given the way section 512 and the recourse to subordinate funds works. Your honor, we talked a lot about how the municipal bond market works and usage of trade and the like. I do want to add to the discussion and to the argument one thing that the other side hasn't talked about, and that's the form of bond and the opinion of counsel. Both of those, which we believe confirm that recourse is in fact limited. The opinion of counsel, which is contained in pages 17 through 18, 17 through 20 of the supplemental appendix provides, and I quote, the bonds are valid in binding special obligations of the authority payable solely from the sinking funds. The form of bond, which is contained beginning on page 193 of the appendix, provides that PREPA hereby promises to pay solely from the special fund provided, therefore, the principal and interest on the PREPA bonds. So, when you're talking about payment, though, is that differentiated from what is, you know, I could have collateral and I could have an obligation to get it to you, to pay it to you, and we could agree on a mechanism that it will first go through this waterfall, go into this fund, then be paid to you. And so everything is payable solely from this fund, but it will eventually include everything. So I'm not seeing how the focus on what's solely payable from helps you. So, Your Honor, if I understand the question correctly, the payable potentially from everything, that relates to, okay, so what is exactly in the sinking fund and the subordinate funds at the time that the trustee is suing to collect? One of the errors that Judge Swain made, which I'll get to hopefully in a minute, is that she failed to overlook the fact that under 502B of the bankruptcy code in determining what the allowable amount is of a claim, you value that allowable claim as of the petition date. You don't value it in terms of what that collateral or that recourse could be 100 years from now, like she did during the estimation exercise. So, we do think that for purposes of 804, and I think equally important for purposes of 502 of the bankruptcy code, the relevant inquiry is what is the amount of recourse or what assets can the bond trustee look to as of the petition date? I mean, on that very point, the opinion of counsel says very clearly that the agreement creates a legally valid and effective pledge of the net revenues subject only to the 1947 indenture and of the money, securities, and funds held or set aside as security for the bonds. So, it says that very clearly. So, we need to read that in conjunction with the solely payable language. And how do those, what you're focusing on is just half the language. That's correct, Your Honor. I'm focusing on the recourse part. With respect to the security interest and whether that security interest is the sinking fund, whether it's a sinking fund, it's a boarded fund, or whether it's net revenues, I agree with the arguments made on Mr. Bean's talk. I think that there are two huge issues there that the bondholders can't overcome. The first is while PREPA may have granted a security interest in future net revenues, that security interest will not attach. In fact, it cannot attach, according to the law, until PREPA actually has an interest in those future net revenues. And therefore, can I finish the answer to your question, Your Honor? And therefore, the fact that PREPA, or I'm sorry, the bondholders can have a properly perfected security interest today and revenues that don't yet exist, we don't believe is possible under the DCC. So, you're saying you could never have a security interest in after-acquired property where the acquisition occurs post-discharge?  With regards to the structure that existed under the trust agreement, PREPA could, of course, grant a security interest in net revenues that could potentially come into existence later. But under the DCC, that security interest would not attach until that property actually existed. And therefore, they would not have a security interest in revenues that don't yet exist. Right, but I think what they're arguing is, again, you say you don't know where this number comes from, but they're saying there are $5 billion of revenues that have come in in the last six years or so, and they exist until the security interest is attached to them. So, Your Honor, I know I'm over. Can I answer that one last question? Because I did want to get to it, and I think it's an important distinction I need to make, is they're relying on Section 928 for the proposition that, to the extent they have a lien on special revenues in this case, I think they would concede net revenues, therefore, are special revenues, that 928 continues that lien, 552A, the bankruptcy bill does not cut it off. I think it's very important to keep in mind, 928 may, in fact, preserve a lien on special revenues, but it does not fix any limitations or issues with that security interest. And what do I mean by that? To the extent that they have not properly perfected the security interest on those revenues, 928 will not fix that. Similarly, to the extent that those revenues don't yet exist, 928 will not create a security interest. But why haven't they perfected their lien in that, let's just assume it's $5 billion of the revenues that have already come in. Why isn't that perfected? In order to properly perfect a lien on revenues, they either need to have physical possession of the revenues, or they need to have control over the accounts in which those revenues reside. As Mr. Beanstalk correctly pointed out in his argument, there are only the sinking fund accounts over which the bondholders have a perfected security interest over which they have control. And therefore, the other revenues, they would not have a properly perfected security interest, and 928 is not going to remedy that problem for them. Judge Howard, do you have any questions? No. Thank you. Thank you, counsel. At this time, the counsel for the Puerto Rico Fiscal Agency and Financial Advisory Authority please introduce himself on the record again. He has a 13-minute answer. You may plead the court. I'm Peter Friedman from O'Melveny & Myers on behalf of AFOF. Judge Rickleman, let me answer your question directly. Although it's not part of the record, there's reference in certain unaudited financial statements that discuss net revenues, but there's no cash existing. In fact, the Commonwealth and AFOF publish monthly cash reports, also not in the record, that show nothing like $3 to $5 billion in PREPA's accounts. I assure you this case would be dramatically different if PREPA had between $3 to $5 billion in cash in its accounts. What is the actual reality is PREPA has hundreds of millions of unpaid pension liabilities, a system that's still in terrible disrepair and provides uneven power to its customers, uneven as generous. There is not $3 to $5 billion that's been accrued without a higher legacy charge imposed over the last few years to pay bond debt service. It's just not true. The second thing I wanted to mention with respect to Judge Kayada's question is I think one of the issues here is the way money gets into the accounts is through a covenant, right? Not a lien. There's no lien when the money comes in. It goes into accounts. The lien attaches. The interim step is a promise. That promise is unenforceable in bankruptcy. That's where the gap is. 928 doesn't cure it and nothing in the contract. There's no specific performance they can require that PREPA put the money into the accounts if it doesn't have a lien as soon as PREPA receives the money. It only becomes lien when the money goes into those accounts and creditors cannot force PREPA to put the money into the accounts because that's just a promise and as Judge Markell said in the monorail case, promises get broken in bankruptcy. I want to address more specifically, though, the issue of the claim. I am here, although I agree with the oversight board and the unsecured creditors committee, to say that if you disagree with their recourse argument, that Judge Swain got it right on estimation. Judge Swain, in the estimation context, gave a rough, it's actually much more than a rough evaluation of the bondholder's claim. She was quite precise. She explained why at most the bondholders have an allowable claim under the Bankruptcy Code to whatever the net present value of revenues minus current expense, meaning net revenues, that PREPA could have obtained over 100 years by the bondholders exercising the equitable remedies they have in their contract. Many of her decisions are subject to abuse of discretion, their credibility determinations. Remember, what Judge Swain ultimately determined is that PREPA bondholders and their witnesses and experts didn't understand Puerto Rico, its economy, its legal system, or its electric utility, and those decisions have to be deferred to. What unsecured claim would not be subject to estimation? I think if they had a claim that didn't look like what 701 and 804 provide, that wouldn't be subject to estimation, but it's really important to look at 701 and 804. Let me tell you why you don't need to look at 805. 805, unlike 804, never uses the word collection. It's about application of funds. It's not about creating new funds. It's not about permitting the trustee to do anything other than interact with the counterparties, with the bondholders. 805 is pie dividing, not pie creating. 805 also talks about this one important distinction between 804 and 805. 804 uses available for such purpose, present tense. 805 shows that the drafters wanted to encompass future revenue. They knew how to say money that might become available in the future. Critical distinction. Let's go back to 701. The bondholders look at the first sentence of 701, but they ignore the critical limitations on payment that exist in the third section of 701. 701 is a covenant. It's a promise to pay. What 701's third sentence says is that covenant is limited by their collateral. 701 is also a huge sign that says, look up, look up. It says, basically it uses the word in the manner and to the extent here and above particularly specified. Flash and light. Look up. Bookended by the words of agreement clause, which uses the words as following, saying look down. Look at the interstices to tell you what is the subject of their lien, and what 701 is telling you is their lien is coextensive with their right to the payment. That's why it was appropriate for Judge Swain to conclude that the most they could get was what would happen if you exercised remedies. But why do we ask what is the most you would get? I mean, you have an agreement to pay me $10 a year for the next 10 years. You then file bankruptcy. That debt gets discharged, but I get an allowed claim. Suppose there are nine years left. Wouldn't I get an allowed claim for $90? Sure, but that's not what this agreement says. And this just seems to layer onto that, and by the way, I also have these remedies I could pursue against you. Why should that give me less of a claim because my agreement gives me more remedies? Because 804 says you can only collect what those remedies give you. And 701 says you only get paid by reference to your liens. And so what it's really saying is there's a bucket, and you're going to get paid from whatever is in that bucket. And what Judge Swain did was, through the hearing of testimony, figure out what was the net present value of the revenue stream that would go into that bucket. That's what the bondholders agreed to, but with respect to the use of the language in 804, the solely language. They were saying we get paid by the net revenue that comes in. And so what Judge Swain concluded is, okay, they don't have a lien, but I'll give them an unsecured claim to the net revenue that would have come in in the future after taking into account all the current expenses that had to be paid. So you're saying it's like my hypothetical, except instead of saying you'll pay $10 a year, it says you'll pay $10 a year, but only to the extent you can find the money buried in your backyard. Yes, that's exactly right. She would then have a fact-finding hearing that's buried in the backyard. She would have something better than what's buried in your backyard. You had Judge Swain assume that a receiver would go out and do the best it possibly could, consistent with the facts of Puerto Rico and the law of Puerto Rico, to raise as much revenue as possible. She basically said, Trepa, you go out with the receiver, and you collect, and you fill up that bucket that the bondholders agreed would be the sole source of their repayment, and then you, basically, bondholders, get a claim for that amount. And I think the $2.4 billion is unassailable. Bondholders don't even try in their reply brief to respond. Counsel, I think what they say, though, is that they haven't found any case where a court did an estimation when you had just a bond, that all the courts just look at the face value of the bond, and that's it. Is that correct? Is there any case that does what Judge Swain did here with bond? So they point to Oakwood Homes as their principal case, and Oakwood Homes doesn't have any limiting language about solely. They don't point to another case that has the wet language, solely, and says, notwithstanding solely, we still get everything. I think that the really only thing on them is to say, given 502's requirements, right, that you estimate rights arising from equitable claims, I think the burden would be on them to say, notwithstanding this very specific language, we get more than we're contractually entitled to. There is a case. I understand you think that language here is the most important thing, and clearly language is important, but is there any other case where a court has estimated rather than just give the face value of the bond? Can you just answer that? I think Ventero, 735 S. 2nd, 740, the Second Circuit, 1984. It doesn't estimate, but what it says is, okay, you sell your collateral. Somebody lost their lien, right? It was under-affected, and the collateral was sold. What used to be their collateral was sold, and this is under the Bankruptcy Act, so it's not on all fours. I don't want to be misleading, Judge Wigelman. This is a Bankruptcy Act, not a Bankruptcy Code case, if I'm remembering correctly. But basically, the ship was sold in that case, and what the court said is, you don't get a claim to your full amount lent. Your claim is cabined to the portion of what used to be your collateral that got sold. You have an unsecured claim, which is kind of what Judge Slane did here. She said, how much collateral would come into the estate, right? Even though it's no longer collateral because you're not perfected, you get a claim that reflects that. So I think that's the best parallel. I do think this is certainly an unusual situation, so I'm not terribly surprised, but I suppose that's not persuasive to you that I'm not surprised that there's not this out there. But I do think 701's limitations, just to get back to 701 for a moment. First of all, 701 says they're payable solely from revenues, which they interpret to mean from all revenues, but that's not right. Solely is a word of limitation. It's like if there was an agreement with the U.S. government that you get paid solely from dollars. It wouldn't mean you get printed from all the dollars the U.S. Mint prints. You just get paid solely from some set of dollars. Well, why is that? If it says I get paid solely in dollars, then whatever amount you owe me I get in dollars, even if I have to empty the U.S. Mint. Well, because it doesn't say all dollars. It says solely. It's telling you you don't get paid anything else. That's just saying I'm not getting paid in apples and bananas. I'm getting dollars. And solely revenues is a limited principle here, right? And then it says in the next sentence, I think hammering home, first of all, in the covenant that grants them their right to payment, it uses the word pledge to payment, linking payment to payment. And it says in the manner and to the extent here and above particularly specified. I want to linger on the word particularly specified. I think the word particularly specified emphasizes how strongly the drafters of this contract didn't want you to look outside the contract at anything else. They didn't say just specified. They emphasized particularly specified, which I think undermines the idea that you should look outside the agreement for custom or trade or anything else. Again, it's a flashing light saying look at what's going on inside, not anything else. And the limitation in the manner and to the extent specified above reinforces that promises to pay are limited in the manner, how, and extent, how much, in a way that mirrors what's here and above particularly specified. In other words, PREPA promised to pay funds to the bondholders over which they have a lien. And the liens are set out in Articles 4 and 5. I want to make another point about the second sentence of Section 701. I want to make two other points about Section 701. First of all, the gold entry is incorrect about what Judge Swain did and found with respect to 701. In her opinion, she actually, when talking about 701, does specifically reference the lien-granting provisions, not just the payment provisions. The second point is the second sentence of 701 deals with the pledge of renewal and replacement fund when the 47 indenture was still around. What that shows is the pledge of revenues was subject to the 47 indenture referenced in the now therefore clause proves that a pledge of revenues was really a lien on a fund, the renewal and replacement fund, which net revenues were deposited into, which is precisely the point we're making here, that the pledge is over specific funds, not all revenue that comes into place. One other point I think that's important, the bondholders on page 9 of their reply claim that Section 804 helps them. They actually put a period after the word otherwise, but there's actually no period in this section. There's an ellipsis. They ignore the remaining 137 words in that section to submit are critically important. Thank you, Your Honors. Appreciate it. Thank you. We will take a five-minute break, and then each table will have a five-minute rebuttal, should they wish to present it through one person. Thank you, Your Honors. All rise. Arguing counsel, please let's return. Yes, I think we're all ready. Mr. Brunstad, you got the short straw. Thank you, Your Honor. Yes, I got the short straw. Please reintroduce yourself on the record. Eric Brunstad on behalf of the ad hoc PREPA bondholders, but more collectively the bondholders as a whole. I'd like to begin with a key fundamental point. Mr. Bienstock's arguments about after-acquired collateral are 100 years too late. If his arguments, if their arguments were correct, it would totally destroy the entire field of security financing in inventory, after-acquired inventory, accounts, revenues, after-acquired revenues. It simply is wrong, and it's wrong because the statute says so. Section 9204 says, quote, a security agreement may create or provide for a security interest in after-acquired collateral. Notice that 9204 does not use the term attachment. The property right is created and is enforceable and is a property interest when the security agreement is signed. It then attaches to the collateral when it comes into existence later under 9203, but the lien itself begins when the security agreement is created, when the debtor signs it, and that lien is a lien on the stream, not the individual drops within it. A good example of after-acquired collateral, Judge Hayata, you asked about that, is suppose you have a hotel that has a lien on the revenues of, your credit has a lien on the revenues of the hotel. That includes both existing and after-acquired revenues. It is on the stream. It is perfected, Judge Rickleman, by a properly perfected security interest, a properly filed financing statement. That covers the entire stream. That's all that you need under 9310 and 9308 in the perfection provision. But you're saying you can't get rid of the debt. So, Judge Hayata, we have to distinguish the debt, which is the right to payment, and the lien, which is the property right in the collateral to secure the payment, and the remedies. Those are three different things. Right. But where the lien is in essentially all the revenues, all the net revenues, then it's pretty indistinguishable from saying that notwithstanding bankruptcy, you're stuck with the full debt. No, you're not. No. We've settled this case three times. We're far less than the debt that is out there. Three times we've settled it. Three times that Avery and me have gone to settle it. Well, let's not get into settlement. There are practical reasons why people settle that don't always help analytically. The point, Judge Hayata, is that you can do a plan of reorganization where the party retains the lien for less than the amount that is owed. The proper way to do it is not to do evaluation like Judge Swain did on estimation. But it would take consent of the creditor. It doesn't have to be on the consent of the creditor. That's the point of 1129B. Without the consent of the creditor, if the creditor, all the bondholders said no, as long as the plan is fair and equitable, and this is what the language says, Judge Hayata, over their dissent, you can still confirm the plan, provided the holders of such claim retain the lien securing the claims, and they're paid the value of the property. So if the property is worth $7 billion, that's what they get. You can restructure a lien on revenues, including the revenue stream. You can get rid of the debt if you pay the whole debt. Or if you pay the value of the property securing it. So if the debt is $8.5 billion, which it is, and that's the amount of the claim, there is no case that estimates it. There just is none, so it's improper. If the value of the collateral is $7.5 billion, that's what you get paid. That's how you restructure this. So it's a fight over the valuation of the collateral, not what is your remedy worth, as happened in the estimation proceeding, where you look backwards in time from 2017 backwards. It's what is the value of the collateral on the confirmation date. That would be, for example, in March of this year. You have to have experts that say the value of the collateral is worth, for example, $6 billion. If that's the value of the collateral, that's what the secured creditors get paid because it can reduce the debt and reorganize it. And briefly, because you've got less than a minute left, what do you say about the proposition that until the money is in the sinking fund, it's not a perfected security interest? Because the trust agreement 10 times says it has a lien on the revenue. No, but is it perfected? The perfection and the grant of the lien are two different things. The security agreement grants the lien in the granting clause in Section 702, and in the further security provisions in Section 401 and 507, grant a lien on the proceeds. As the expert explained, it is common practice to have overlapping liens on the stream of revenues like this and supplemental liens on the proceeds that are deposited into accounts. The lien on the revenues accounts for general intangibles. What's deposited is the deposit account perfected by control. And here's the key point. Your time is up. Yes, sir. Thank you. Thank you, counsel. At this time, counsel for the athletes would please introduce themselves back on the record to begin this five-minute rebuttal. Thank you. My name is Martin Beanstock, and Proscauer Rose for the Oversight Board is Title III representative of PREPA. Your Honor, Uniform Commercial Code Section 9-203b2 provides that a security interest does not attach until the debtor has rights in the collateral. That is the problem that the bondholders are wrestling with. They have no rights in tomorrow's revenues because they don't have a security interest in PREPA's right to receive them. And they certainly have no rights in next month's revenues because PREPA hasn't earned them yet, let alone generated an account receivable. But they say next month when PREPA gets them, it will attach. The preexisting after-acquired security interest will then at that point attach. I think that's their argument. Yes, it will attach in the future, but they don't have a secured claim today. The bankruptcy at the latest, at the confirmation date, is going to determine what secured claim they have as of that date and pay it what's necessary and discharge anything that doesn't have to be paid. The agreement goes away. They're not going to have 928 rights after confirmation and discharge. Otherwise, in short, no Chapter 9 municipality case could be organized because you'd be stuck with your future revenues being encumbered by past obligations. The discharge wouldn't be there. Judge Rickleman, you asked a question that I'm going to give an analogy and try to put it in reverse. Some people are lucky enough to have non-recourse home mortgages. So when you have a non-recourse home mortgage, the mortgagee, if you don't make your mortgage payment, can foreclose and take the house but cannot get a judgment against you to go after your other assets. Most mortgages have covenants. The primary two are the homeowner covenants to pay the real estate taxes, because that comes ahead of the mortgage lien, and the homeowner covenants to keep the house insured because if it gets destroyed, the mortgagee is out of luck. When the homeowner violates those covenants by not paying the real estate taxes or not insuring the house, that doesn't make the non-recourse mortgage into a recourse mortgage and let the mortgagee get a judgment against the homeowner. It just lets the mortgagee declare a default and foreclose. That is the situation we have here. Instead of the trust agreement saying that the bondholders can only foreclose on PREP as house, it says the bondholders can only take the collateral, which is the money in the special funds. And that's why your honor asked, is there any judgment where you had a claim and the court estimated it? Not a non-recourse claim. Judge Swain went above and beyond what she needed to do. Because this was non-recourse, there was no basis to give them a recourse claim of $2.388 billion. Our trust agreement says payable only from the special fund, no different from payable only from my house. It doesn't generate a recourse claim. Fifth Amendment is a hoax. The Fifth Amendment only applies... Not generally though, right? Well, I stand corrected. The Fifth Amendment argument is a hoax. The Fifth Amendment in bankruptcy applies to secured claims. And that's exactly what the bondholders do not have. But they were trying to get from this panel by saying, well, even though tomorrow's revenues don't exist yet, and even though we don't have them, so our security interest could not attach to them, let's make believe we did have them and we'll have them forever. And we want all that value. The Fifth Amendment doesn't apply unless they have a valid, perfected, secured claim today, or it's a confirmation date. And that's where it's a fallacy for them to argue otherwise or to ask this court to believe otherwise. The security agreement definition in the Uniform Commercial Code uses language that it creates and provides for security interests. That's where the language in 9-204 came from. You can create and provide for a security interest in after-acquired collateral. That doesn't mean that the security agreement in tomorrow's revenues that you provide for exists today. It doesn't mean it's attached today. It doesn't mean it exists. It will exist tomorrow if things keep going forward. Thank you, Your Honor. Thank you. Thank you. This is obviously a very complicated case, and the court very much appreciates all the hard work and preparation of counsel. Thank you.